UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| United States of America, | No. 19-20025 |
| Plaintiff, | Hon. Gershwin A. Drain |
| v. | |
| | **Offense:** |
| D-1 Aswanth Nune, | 18 U.S.C. § 371 |
| | Conspiracy to commit visa fraud and |
| Defendant. | harbor aliens for profit |
| | |
| | **Maximum Penalty:** Up to 5 years |
| | |
| | **Maximum Fine:** $250,000 |
| | |
| | **Supervised Release:** |
| | Up to 3 years |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Aswanth Nune is a foreign citizen who abused the student visa program so that he could remain and work in the United States illegally. Moreover, he recruited other foreign students to do the same, and in return for his recruitment efforts, he received more than $25,000 in profits. Accordingly, the United States of America respectfully recommends that the Court impose a sentence within Nune's guidelines range of **15–21 months**, as calculated by the U.S. Probation Department. Such a sentence is necessary in light of the seriousness of the offense, the need to

punish Nune, deter Nune and others from committing the same misconduct, Nune's personal characteristics, and to avoid unwarranted sentencing disparities.

## I. BACKGROUND

Defendant Aswanth Nune is a citizen of India who first traveled to the United States on a temporary student visa known as an F-1 visa. (PSR p.3; ¶¶ 9 and 40). Before he could obtain his F-1 visa, Nune applied to study in the United States at a university through the Student and Exchange Visitor Program ("SEVP"), which is overseen by the Department of Homeland Security. (*Id.* at ¶ 10–11). Once accepted by a university—in this case Northwestern Polytechnic University[1]—the school issued a "Certificate of Eligibility for Nonimmigrant Student Status," better known as a Form I-20. (*Id.* at ¶¶ 10–11, 46).

Nune's Form I-20 permitted him to enter the United States, (*id.* at ¶ 12), which he first did on April 2015. (*Id.* at ¶ 42)(Post Arrest Interview). While in the United States, he used his Form I-20 for identification and proof of legal and academic status in the United States, and it also allowed for him to travel abroad and return to the United States. (*Id.* at ¶ 12). For his Form I-20 to remain valid, Nune knew that he needed to maintain his status as a full-time student "making progress toward

---

[1] *See* https://www.buzzfeednews.com/article/mollyhensleyclancy/inside-the-school-that-abolished-the-f-and-raked-in-the-cash (last visited June 17, 2019) (describing the "educational" practices of Northwestern Polytechnic University).

2

completion of [his] field of study," whether at his original school or any school to which he later transferred. (*Id.* at ¶ 11); (*see also* Dkt. # 25, Plea Hrg. Tr., PgID 84).

Nune's visa and Form I-20 also permitted him to participate in curricular practical training ("CPT"), which in essence permitted him to find gainful employment as long as he continued to attend classes and make academic progress toward his degree. (PSR, ¶¶ 12-13).

From May 2017 through January 2019, undercover agents from Homeland Security Investigations ("HSI") posed as employees of the University of Farmington ("the University"), located in Farmington Hills, Michigan. (*Id.* at ¶ 14). The University had no instructors, no classes, and no educational activities. Rather, it was a fictitious university used by foreign citizens as a "pay to stay" scheme. (*Id.* at ¶15). Under the "pay to stay" scheme, foreign citizens would enroll with the University as "students," but they would take no classes nor attend any educational programs; instead, they would pay tuition so that the University would issue them Form I-20's that identified them as students making progress toward a degree, and if they desired, they could also seek gainful employment through the CPT program. (*Id.*).

On June 7, 2017, Nune contacted the University to discuss enrolling in the University without attending classes in order to illegally work in the United States and fraudulently maintain his immigration status. He told the HSI Agent that he and

his friends were just looking for a way to maintain status and were not interested in attending classes. (*Id.* at ¶ 16). Below is an excerpt of that conversation:

> *HSI Agent: "So they actually want to come to class and learn, and everything like that, huh?"*
>
> Ashwanth Nune: "Oh, no, no, no. They want CPT."
>
> *HSI Agent: "Oh, that… that's what they want?"*
>
> Ashwanth Nune: "They want CPT, yeah."
>
> *HSI Agent: "Yes, so listen. Like right now. I mean, I don't know if this is what you're looking for, or your friend is looking for. But I don't have any room for my Fall Semester … for Fall Quarter. Ah, if they want … just a way to keep their status, or whatever, I guess we can do it. But we have to keep it just between us. You understand?"*
>
> Ashwanth Nune: "Yeah, yeah. Got you boss."
>
> *HSI Agent: "Is that what they want?"*
>
> Ashwanth Nune: "Yes."
>
> *HSI Agent: "Okay. Do you know …who is your friend? I mean, you know, just have your friend call me. Because I have to explain to them, you know, this is not legal. So we have to keep it between us. You know?"*
>
> Ashwanth Nune: "Yeah, yeah I am going to. No problem …."

During his various face to face meetings with the HSI Agent at the University, Nune continued his conversations regarding his enrollment in the school and to see if he could receive concessions for recruiting other students to the school. (*Id.*)

4

Nune reached an agreement that he would receive a referral fee of $500 per student for the first four recruited students and discussed collecting $1,000 for each recruited student thereafter. (*Id.*)(*see also* Dkt. # 25, Plea Hrg. Tr., PgID 88-89).  During his discussions with the HSI Agent, Nune plainly stated that the only reason he wanted to attend the University was to maintain his status, and he knew that he was not going to be attending any classes and that such an arrangement was illegal. (Dkt. # 25, Plea Hrg. Tr., PgID 86-87).

In total, Nune recruited at least eighteen students, and he also received profits – through a combination of tuition concessions and cash payments - in excess of $25,000 from the University. (*Id.* at ¶¶ 18-19). Below, Nune can be seen counting the money he just collected from an HSI agent (whose image is obscured):



Nune has pled guilty to conspiring to commit visa fraud (18 U.S.C. § 1546(a))

and harboring aliens for profit (8 U.S.C. § 1324) in violation of 18 U.S.C. § 371—without the benefit of a Rule 11 agreement, although the government did offer one. (PSR, ¶¶ 1, 4). Nune's co-conspirators are the foreign citizen "students" he recruited. (*Id.* at ¶¶ 18, 19).

The maximum sentence for his offense is not more than five years' imprisonment, a maximum fine of $250,000, and an applicable term of supervised up to three years. (PSR, p. 2; ¶¶ 53, 56, 61).

## II. SENTENCING GUIDELINES CALCULATIONS AND § 3553(a) FACTORS

In determining an appropriate sentence, the Court should use the Sentencing Guidelines as a "starting point and the initial benchmark." *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). Indeed, a sentence within the guidelines range carries a "rebuttable presumption of reasonableness." *United States v. Buchanan*, 449 F.3d 731, 734 (6th Cir. 2006). This is so because the guidelines "represent nearly two decades of considered judgment about the range of sentences appropriate for certain offenses." (*Id.* at 736) (Sutton, J., concurring). In particular, the guidelines aggregate the "sentencing experiences of individual judges, the administrative expertise of the [Sentencing] Commission, and the input of Congress…." *Id.*

Beyond the Guidelines, the Court should consider all of the factors set forth

in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49–50. The § 3553(a) factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; [and]
> > \*\*\*
> (6) the need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct….

18 U.S.C. § 3553(a).

### A. Nune's Sentencing Guidelines

The government agrees with the Probation Department that Nune's total offense level is 14 and his criminal history category is I, which results in a guideline range of **15–21 months**. (PSR, ¶ 54); (*see also id.* at ¶¶ 24-33).

Nune's conduct in this case demonstrates why a sentence within the guidelines is appropriate. Nune may suggest his role in committing fraud and harboring illegal aliens for profit stemmed from his attempt to help foreign national students obtain an education—including for some students who sought to transfer from schools that were in danger of losing their accreditation.[2] But his and his students' aims were not

---

[2] These schools cater to "students" who want to exploit our foreign student education program. While they are the exception rather than the rule, unfortunately

7

so noble.

Their true intent could not be clearer. While "enrolled" at the University, one hundred percent of the foreign citizen students <u>never</u> spent a single second in a classroom. If it were truly about obtaining an education, the University would not have been able to attract anyone, because it had no teachers, classes, or educational services. Instead, Nune and the foreign nationals he recruited wanted to commit a fraud upon the United States. At the outset, Nune informed his recruits there would be no classes and no education. The "students" willingly paid thousands of dollars to the undercover agents so that they could obtain fraudulent documents (Form I-20's) that would allow them to illegally stay, re-enter, and work in the United States.

But Nune's conduct was much more offensive than that of his recruits. Once he knew exactly what the University was—a fraud—he, not the University, raised the idea of recruiting other students who would be willing to commit fraud. He did so in order to make money. Specifically, in exchange for finding and enlisting others to remain in the United States illegally, he received more than $25,000 in profits and tuition credits. Hence, his illegal arrangement with the University proved to be quite

---

they do exist. Some of the "pay to stay" schools located around the United States that have been exposed over the years are: Prodee University; Neo-America Language School; Walter Jay M.D. Institute; the American College of Forensic Studies; Likie Fashion and Technology College; Tri-Valley University; Herguan University; the University of Northern Virginia; and the American College of Commerce and Technology.

profitable for him.

Therefore, Nune's conduct necessitates a guidelines sentence, and there are no legitimate reasons to vary below that range. PSR ¶ 67. Nonetheless, under our immigration laws, Nune must be sentenced to at least 12 months in custody to permanently bar him from re-entering the United States. Such a bar is certainly fitting in this case, since Nune intentionally exploited our student visa system for his own financial gain. He did so with the full knowledge that most of his recruits wanted to illegally enter the United States job market while unlawfully remaining in the United States. As a direct result of his actions, his recruited students—who were illegally working in the United States—deprived otherwise qualified individuals from obtaining employment or training.

### B. Sentencing Reform Act factors

#### 1. Seriousness of the offense

Nune's decision to conspire to harbor aliens and commit visa fraud is a serious offense, as indicated by Congress's decision to authorize up to five years in prison for the offense. *See* 18 U.S.C. § 371; (PSR, ¶ 53). Specifically in this case, the F-1 student visa program is designed to promote and encourage foreign students to study at American institutions. (PSR, ¶¶ 7–13). Once they finish their course of study, the students must leave within 15 days. (*Id.* at ¶ 13). The idea is that the students return to their native countries to share their new knowledge and skills for the betterment

of themselves and their country. Accordingly, the F-1 student visa program is not a naturalization program—i.e., it is not intended to be a path to obtaining U.S. citizenship.

If he receives a guidelines sentence, Nune will be deported once he serves his sentence, and he will be permanently barred from returning to the United States in the future. And even without a permanent bar from a guidelines sentence, Nune will likely be deported, and there is no way to know whether he will return to the United States. Yet his likely deportation should not trigger a variance windfall, as defense has argued.

The Sixth Circuit has been clear that 18 U.S.C. § 3553 requires that the defendant's sentence reflect the seriousness of the offense, promote respect for the law, and provide just punishment. *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014). Deportation is *not* part of the defendant's sentence. Many things that happen to a defendant following his conviction and sentence are "impermissible facts" in determining a sentence. *Id.* Things such as losing a professional license, paying legal fees, suffering embarrassment or a damaged reputation, or as is the case here, being deported, are not part of this Court's sentence.  "None of these things are [the defendant's] sentence. Nor are they consequences of his sentence," and a district court should therefore sentence the defendant "without considering these factors." *Id.*

Furthermore, Nune and his co-conspirators (his recruited students) ignored the purpose of the F-1 student visa program. In fact, Nune has remained in the United States since 2015, totaling over four years in the United States before he was arrested on January 31, 2019. (*Id.* at ¶ 2). During those years, in particular during his time with the University, Nune illegally obtained employment at various companies at pay rates ranging from $32,000 to $71,000 per year (*Id.* at ¶¶ 49-50). Those jobs could have gone to U.S. citizens or to other foreign students who were not engaged in on-going criminal conduct and were lawfully in the United States on valid visas.

### 2. Deterrence, protection of the public, and nature and circumstances of the offense

As noted above, Nune will likely be deported, and thus the likelihood of him re-engaging this particular criminal conduct is highly unlikely. However, the Court's contemplation of §3553 factors regarding deterrence and protection of the public is not solely limited to whether the defendant is likely to be a recidivist. Rather, this Court is likewise required, in determining an appropriate sentence, to seek to deter others from committing such crimes and protect the public. This Court should do so in this instance. According to an SEVP summary issued by U.S. Immigration and Customs Enforcement in November 2016, 1.23 million foreign students were studying in the United States on student visas in 2016, and 8697 schools were

certified to enroll international students.[3] A within guideline sentence for Nune would invariably serve as a warning and act as deterrence to any of the other one million other foreign students that are currently studying on student visas in the United States who may contemplate engaging in similar such conduct.

Additionally, this action and the related actions—19-cr-20024 and 19-cr-20026—have garnered considerable media attention since the indictments were unsealed. Presumably, the sentences in this case and the related cases will also receive media focus. As a result, strong sentences against Nune and the other defendants would have a considerable chance of deterring other foreign students—and some schools—from abusing the F-1 student visa program. In addition, as indicated by the success Nune and the other defendants had in recruiting students to the University, at the very least their vast network of students and potential students could be deterred by guidelines sentences.

In light of the above, a deterrent prison sentence between 15 and 21 months is appropriate.

### 3. Characteristics of the defendant

Nune indicated he has a loving and supportive family and friends, both in India and in the United States. (PSR, ¶¶ 40-41). He attended a university in India and obtained a degree in engineering, and he also earned a Master's degree from

---

[3] https://www.ice.gov/doclib/sevis/pdf/byTheNumbersDec2016.pdf (p.2).

Northwestern Polytechnic University. Thus, he has received support, love, and opportunities that many defendants who appear before this Court have not, and yet he still chose to commit the instant offense. As a result, Nune's personal characteristics counsel that a prison sentence of 15–21 months is appropriate.

### 4. Need to avoid sentencing disparities

The Supreme Court reiterated in *Booker* that reducing sentencing disparities was Congress's basis statutory goal in passing the Federal Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220, 250, 264 (2005). Thus, calculating and analyzing the guidelines is the primary driver in avoiding unwanted sentencing disparities. *Id.* at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). Indeed, by correctly calculating and considering the Sentencing Guidelines, the Court automatically gives "significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007). A variance in this matter would result in unwanted sentencing disparities.

Furthermore, a variance based on deportation would be contrary to the dictates of 18 U.S.C. § 3553 (2)(A) which requires that the defendant's sentence reflect the seriousness of the offense (see above). By allowing the Court to consider deportation as grounds for a downward variance for illegally harboring aliens, it would invariably grant the Court the authority to vary for an alien yet bar similar such

13

consideration for an equally culpable defendant, who happens to be a U.S. citizen, and not subject to deportation. In essence, it would reward an alien while punishing a United States citizen for committing the exact same offense. This is universally unfair and would likewise run afoul of 18 U.S.C. Section 3553(a)(6) which mandates that the Court's sentence should "… avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Here, Nune sought to abuse the student visa program so that he could remain and work in the United States illegally. While illegally present in the United States he chose to line his own pockets when he proposed illegally making money by harboring and recruiting other foreign students to do the same. In return for his recruitment efforts, he received more than $25,000 in profit. Such calculated criminal acts do not warrant a downward variance.

Therefore, this factor favors a prison sentence within the guidelines range of 15–21 months. However, the Court should also be mindful of the six other recruiters charged in a related case, 19-cr-20026, for whom it will have to impose sentences in the near future. Like Nune, those recruiters helped enlist hundreds of foreign citizens to enroll at the University with the goal of fraudulently maintaining their status in the United States. *See United States v. Kakireddy et al.*, No. 19-cr-20026 (E.D. Mich.) (Dkt. # 1, PgID 9). Because Nune and Prathipati (19-cr-20024) will be the first and relatively least culpable of the eight defendants to be sentenced, Nune's

sentence will be the important in setting the base from which the more culpable defendants should be measured from.

### III.    CONCLUSION

For the reasons stated above, the government recommends this Court sentence Nune within the existing guideline range of 15–21 months.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*/s/ Ronald W. Waterstreet*
Ronald W. Waterstreet
Timothy P. McDonald
Brandon C. Helms
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI   48226
Phone: (313) 226.9100
Email: Ronald.Waterstreet@usdoj.gov
Email: Timothy. McDonald@usdoj.gov
Email: Brandon.Helms@usdoj.gov

Dated: August 21, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2019, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will provide notification to all counsel of record.

> */s/Ronald W. Waterstreet*
> Ronald W. Waterstreet
> Assistant United States Attorney